UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEREMY M. WEISS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DHL EXPRESS, INC., | )   Civil Action No. |
| | )   1:10-cv-10705-NG |
| Defendant. | ) |
| | ) |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant DHL Express, Inc. ("DHL" or the "Company") terminated the

employment of Plaintiff Jeremy Weiss in September 2009 after an independent

investigation revealed that Weiss had failed to properly address misconduct committed

by a DHL sales representative.  Given the serious nature of Weiss's management failures,

DHL classified his termination as being for "just cause."  Weiss now alleges that DHL

classified his termination as "just cause" so the Company could avoid paying him six

months of severance pay and a $60,000 retention bonus.  Because Weiss has absolutely

no evidence to support this assertion, the Court should grant DHL's motion for summary

judgment.

## I.      BACKGROUND

DHL is a delivery company.  (Statement of Undisputed Material Facts ("SMF") ¶

1).  Historically, DHL's operations in the United States were divided into sales districts.

DHL typically employed multiple sales representatives in each sales district.  The sales

representatives, who reported up to a District Sales Manager, were responsible for

developing relationships with new customers and expanding DHL's relationships with

existing customers.  (SMF ¶¶ 2-6).  Customers often negotiated with sales representatives regarding the rate they would pay for DHL's delivery services.  If the proposed rates differed from the rates previously endorsed by DHL, the new rates needed to be approved by DHL's pricing department.  Once the approved rates were in place, sales representatives were eligible to earn incentive compensation based in part on the amount of gross revenue their accounts generated for DHL.  (SMF ¶¶ 7-9).

### A.   Weiss Begins Working For DHL In 2004

In 2004, Weiss began working for DHL as a District Sales Manager.[1]  In 2005, DHL promoted Weiss to the position of Regional Sales Director.  (SMF ¶ 15).  As such, he was responsible for overseeing multiple sales districts.[2]  (SMF ¶ 16).  From the end of 2005 until June of 2007, Weiss's territory included Brooklyn, New York, which was referred to within DHL as "District 117".  (SMF ¶¶ 20-21).  In the fall of 2007, DHL named Weiss to the position of Director of National Accounts.[3]  (SMF ¶ 24).

### B.   DHL Selects Weiss To Participate In The Commitment To Success Bonus Plan

Shortly thereafter, in December 2007, DHL informed Weiss that he had been selected to participate in the Company's "Commitment to Success Bonus Plan" (the "Bonus Plan").  (SMF ¶ 26).  Under the Bonus Plan, Weiss potentially could receive a $60,000 service-based bonus and a $20,000 performance-based bonus.  (SMF ¶ 27).  To be eligible to receive either bonus, Weiss had to be employed by DHL on the date of payment.  (SMF ¶ 28).

---

[1]  Weiss previously worked for Airborne Express as a District Sales Manager.  DHL acquired Airborne Express in 2004.  As a result, Weiss became a DHL employee.  (SMF ¶¶ 10-14).
[2]  As a Regional Sales Director, Weiss received an annual salary in excess of $120,000.  (SMF ¶ 17).  In addition, Weiss was eligible to receive incentive compensation based on the growth of his sales region as compared to revenue targets established by DHL.  (SMF ¶¶ 18-19).
[3]  After being named to this position, Weiss's salary increased to $143,500 per year.  (SMF ¶ 25).

The Bonus Plan documents further stated that DHL has the "right to amend, or terminate the Plan at any time." (SMF ¶ 29). Consistent with that reservation of rights, in October 2008, DHL notified Weiss that it had modified the terms of the Bonus Plan. (SMF ¶ 31). Instead of offering a service-based bonus and a performance-based bonus, DHL modified the Bonus Plan so that payouts would be based solely on "continued employment to the [C]ompany with performance remaining in good standing." (SMF ¶ 32). In short, it was now purely a retention bonus.

Under the Bonus Plan as amended, Weiss was eligible to receive 25% of the $80,000 Commitment to Success Bonus in January 2009 and the remaining 75% in January 2010. (SMF ¶ 33). In addition, DHL informed Weiss that if his position was eliminated or he was terminated without cause, he would receive the full amount of the Commitment to Success Bonus. (SMF ¶ 34). On the other hand, if Weiss voluntarily left DHL or was "terminated for good cause prior to the payment dates, [he was] not eligible for the Commitment to Success payout."[4] (SMF ¶ 35). DHL paid Weiss $20,000, the first installment of his Commitment to Success Bonus, in January 2009. (SMF ¶ 36).

### C.   DHL Initiates An Investigation Of Improper Sales Activities

In 2009, DHL received a complaint from a customer alleging that Sergio Garcia, a DHL sales representative who previously had worked under Weiss in District 117, had required that the customer pay him a financial kickback in exchange for receiving a preferential shipping rate. (SMF ¶ 39). Given the serious nature of this allegation, in

---

[4] Thus, the amended Bonus Plan was more favorable to Weiss than the original version. Under the original version of the Bonus Plan, Weiss was not eligible for a bonus if he was not employed as of the payout date, regardless of the reason for his separation from employment. Under the amended plan, however, Weiss remained eligible unless he was terminated for "good cause." (SMF ¶¶ 28, 34-35).

April 2009 DHL retained the law firm of Thompson Wigdor & Gilly LLP ("TWG") to conduct an independent investigation.[5]  (SMF ¶ 40).

During the course of its investigation, TWG interviewed 24 witnesses (including Weiss) and reviewed thousands of documents.  (SMF ¶¶ 41-42).  TWG provided periodic updates to Jon Olin, DHL's in-house legal counsel, regarding the findings of the investigation.  Olin, in turn, periodically shared those findings with Ian Clough, DHL's Chief Executive Officer, and Michael Berger, DHL's Vice President of Sales.  (SMF ¶¶ 43-44).

TWG informed DHL that Garcia, and a number of other sales representatives in District 117, had engaged in a host of improper sales practices during the preceding years.[6]  (SMF ¶ 45).  Among other things, TWG found that these sales representatives had bypassed the Company's standard procedures for establishing customer billing rates, thereby allowing them to charge improperly low rates to customers.  (SMF ¶ 48).  In some cases, the rates were so low that DHL actually lost money on these accounts.  (SMF ¶ 49).  The motivation for this improper behavior was clear:  the sales representatives were eligible to receive incentive compensation based on the total amount of fees received from their customers, regardless of whether those customer accounts were profitable for DHL.  (SMF ¶ 50).

### 1.    Weiss knew of Garcia's misconduct.

Although much of this improper activity occurred after June 2007, i.e., after Weiss no longer was responsible for District 117, TWG's investigation revealed that

---

[5] TWG, based in New York, specializes in litigating complex cases and counseling clients regarding, among other things, employment and criminal law.  See http://www.twglawyers.com.

[6] Garcia, who refused to speak to TWG, resigned prior to the conclusion of the investigation. (SMF ¶¶ 46-47).

Weiss was aware of at least some of Garcia's improper behavior as early as June 2007. (SMF ¶ 51).  Moreover, Weiss attempted to sweep Garcia's actions under the rug.

Specifically, in late 2006 or early 2007 – while Weiss was still responsible for District 117 – Garcia improperly established shipping rates for a customer called Steve Madden.[7]  (SMF ¶ 52).  Instead of obtaining approval of these rates from DHL's pricing department, Garcia manipulated the Company's systems to create the appearance that Madden was affiliated with existing DHL customers who were eligible to receive very low shipping rates.  (SMF ¶¶ 57-59).  By "linking" these accounts to Madden, Garcia was able to give Madden the reduced rates.  (SMF ¶ 59).  Garcia then earned incentive compensation based on the fees paid by Madden to DHL.  (SMF ¶ 60).

Garcia's misconduct regarding the Madden account came to light in June 2007, the same month in which responsibility for District 117 was transferred from Weiss to a new manager, Chris Cadigan.  (SMF ¶¶ 61-62).  Although Weiss no longer was responsible for District 117, he met with Garcia on June 25, 2007 to discuss his improper conduct.  During this meeting, which was conducted in a break room of a DHL office and lasted less than 15 minutes, Weiss warned Garcia that his behavior could result in disciplinary action, including termination.  (SMF ¶¶ 63-67).  Weiss also instructed Garcia to work with DHL's pricing department to correct the pricing on the Madden account.

### 2.      Weiss failed to manage the situation appropriately.

As documented in TWG's written report, Weiss's handling of this situation was deficient in a number of ways.  First, Weiss failed to investigate the extent of Garcia's

---

[7]  Garcia told another DHL manager, Chris Cadigan, that Weiss was involved in the improper set up of this account.  (SMF ¶ 53).  TWG was unable to locate any evidence to corroborate this assertion.  Weiss, for his part, denies any involvement in the establishment of this account.  (SMF ¶¶ 54-56).  Notably, while Weiss was responsible for District 117, his incentive compensation was based in part, on the revenue generated by Garcia and the other sales representatives who reported up to him.

improper behavior.  (SMF ¶¶ 68-73).  For example, Weiss did not ask Garcia (a) how he was able to bypass DHL's procedures for establishing rates, (b) whether he had engaged in similar misconduct with regard to other accounts, or (c) whether he was aware of similar acts of misconduct by other sales representatives.  (SMF ¶¶ 68-73).  In short, despite acknowledging that Garcia had engaged in misconduct that could result in termination, Weiss made absolutely no attempt to evaluate whether this was a one-time occurrence or a systemic problem.[8]  Further, because Weiss failed to question Garcia regarding the means by which he accomplished this fraud, DHL had no way to evaluate what kind of procedures should be put in place to prevent similar acts of fraud from occurring in the future.

Second, Weiss did not document the warning he gave Garcia.  (SMF ¶¶ 83-84).  This failure violated DHL's handbook for managers, which clearly states that verbal warnings "should be documented and retained in the department employee file."  (SMF ¶ 85).  As a result, there was no documentation in Garcia's file that might have alerted future managers to be on the lookout for possible misconduct.

Third, Weiss did not inform DHL's Human Resources or Security departments of this warning or of Garcia's misconduct.  (SMF ¶¶ 86-87).  Had Weiss done so, these departments could have conducted a full investigation of Garcia's misdeeds or, alternatively, taken steps to monitor Garcia's behavior going forward.

---

[8] This clearly was not a one time occurrence.  For example, in September 2007, just three months after responsibility for District 117 was transferred from Weiss to Cadigan, Cadigan and Jon Routledge discovered that multiple sales representatives in District 117 had engaged in similar acts of fraud.  (SMF ¶ 74).  These sales representatives, who resigned rather than face disciplinary action, identified Garcia as the person who taught them how to circumvent DHL's procedures regarding the proper establishment of rates. As a result of these findings, DHL (a) suspended Garcia, and (b) demoted District Sales Manager Michael Gargiles (who had reported directly to Weiss when Weiss was responsible for District 117).  According to TWG's report, Cadigan believed that Weiss should have known about the problems in District 117: Cadigan "blamed Weiss for the "mess" that Cadigan inherited and had to clean up in District 117."  (SMF ¶¶ 74-80).

Fourth, Weiss failed to verify that Garcia had taken appropriate actions to remedy his improper conduct regarding the Madden account. (SMF ¶ 88). Ultimately, as a result of Weiss's failure to manage this situation properly, Garcia remained free to commit future acts of fraud.

Moreover, TWG's findings beg the question of whether Weiss himself was involved in, or had knowledge of, this fraudulent activity while he was responsible for District 117. Indeed, the facts communicated by TWG to DHL suggest that Weiss either (a) did not know that Garcia and other sales representatives were engaging in improper sales activity, or (b) had such knowledge but chose not to act upon it. Although the latter possibility certainly constitutes egregious misconduct, the former possibility suggests, at the very least, negligence on the part of Weiss. Indeed, TWG informed DHL that Weiss acknowledged that he "should have caught" Garcia's behavior while he was responsible for District 117. (SMF ¶ 89).

### D. DHL Terminates Weiss For Just Cause

In the summer of 2009, Olin, Clough, and Berger held a number of meetings to discuss TWG's findings, as outlined above. (SMF ¶ 90). Clough asked Berger for his recommendation with regard to Weiss. Based on TWG's findings, Berger recommended that DHL terminate Weiss's employment for just cause. (SMF ¶¶ 91-92). Clough, Olin, and Berger never discussed the Commitment to Success Bonus program, or Weiss's eligibility to receive a bonus under that program, during any of these meetings. (SMF ¶ 93). Because Weiss was being terminated for just cause, they did not consider paying Weiss any severance. (SMF ¶¶ 94).

In accordance with Berger's recommendation, DHL terminated Weiss's employment on September 2, 2009. (SMF ¶ 97). Shortly thereafter, DHL terminated

two other executives, Steven Berger and Chris Cadigan, as a result of TWG's findings.[9] Because Weiss and the other executives were terminated for "just cause," DHL did not provide them with any severance pay.[10]  (SMF ¶¶ 100-102).

### E.     Weiss Initiates This Lawsuit

Weiss now asserts four claims against DHL.  In Count I, Weiss alleges that DHL's decision not to pay him the remaining $60,000 bonus under the Commitment to Success Bonus Plan violated Mass. Gen. Laws Ch. 149, § 148 (the "Weekly Payment Of Wages Law").  In Count II, Weiss alleges that DHL violated "the covenant of good faith and fair dealing inherent in the parties' employment relationship" by not paying him the bonus and by not providing him with six months of severance pay.  Count III contains a common law detrimental reliance claim premised on DHL's decision not to pay Weiss the bonus.  Lastly, in Count IV, Weiss claims that DHL was unjustly enriched by its decision not to pay him the bonus and severance pay.  As discussed below, these claims are meritless.

## II.     ARGUMENT

Summary judgment is appropriate where, as here, "the pleadings, depositions, answers to interrogatories, and . . . the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As discussed in detail below, summary judgment is appropriate with regard to all of Weiss's claims because he cannot offer any evidence to support his conclusory assertions that DHL characterized his termination as being for

---

[9] John Routledge resigned prior to, and David Katz resigned shortly after, the conclusion of TWG's investigation.  (SMF ¶¶ 81-82).
[10] Weiss started a new job at UniFirst Corporation just one month after he was terminated by DHL.  (SMF ¶¶ 103-08).

"just cause" so that it could avoid paying him severance pay and the remaining $60,000 Commitment to Success Bonus.  See LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993) ("the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party") (internal punctuation omitted); Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (the nonmoving party must rely on more than "conclusory allegations, improbable inferences, and unsupported speculation" to defeat a summary judgment motion).

### A.    Weiss Fails To State A Claim Under The Weekly Payment of Wages Law Because Retention Bonuses Fall Outside The Scope Of That Law

To prevail on his claim under the Weekly Payment Of Wages Law, Weiss must establish that:  (1) he was an employee under the statute; (2) the Commitment To Success Bonus constitutes a "wage" under the statute; and (3) DHL violated the statute by not paying the bonus in a timely manner.  Stanton v. Lighthouse Fin. Servs., Inc., 621 F. Supp. 2d 5, 10 (2009).[11]  Because Weiss cannot establish the latter two elements of his claim, the Court should grant DHL's motion for summary judgment.

---

[11] Weiss does not allege that DHL's decision not to pay him severance pay violates the Weekly Payment Of Wages Law.  See Compl. ¶¶ 38-42.  In any event, such a claim would fail because severance pay does not constitute "wages" under that statute.  See Prozinski v. Northeast Real Estate Servs., 59 Mass. App. Ct. 599, 603-05 (2003) (holding that severance pay does not constitute wages); Fitzgerald v. Chipwrights Design, Inc., 2005 Mass. Super. LEXIS 329, at *6-7 (Mass. Super. Ct. July 1, 2005) (Kern, J.) ("Severance pay falls outside the scope of the Wage Act.").  Even if severance pay does fall within the scope of the Weekly Payment Of Wages Law, Weiss failed to include a claim for severance in the complaint he filed with the Massachusetts Attorney General's Office.  (SMF ¶¶ 109-111).  Therefore, he is barred from asserting a claim for severance pay in this litigation.  See Sterling Research, Inc. v. Pietrobono, 2005 U.S. Dist. LEXIS 31267, at *40 (D. Mass. Nov. 21, 2005) (Saylor, J.) (holding that the Weekly Payment Of Wages Law requires that a complaint provide the Attorney General with "reasonable notice" of the nature of the claim).

### 1. Retention bonuses fall outside the scope of the Weekly Payment of Wages Law.

The purpose of the Weekly Payment Of Wages Law is to limit "the interval between the completion of a work week and the payday on which the wages earned in that week will be paid." American Mut. Liab. Ins. Co. v. Comm'r of Labor & Indus., 340 Mass. 144, 145 (1959). Given this limited purpose, courts construe the statute "narrowly." Prozinski, 59 Mass. App. Ct. at 603. See, e.g., Boston Police Patrolmen's Ass'n, Inc. v. City of Boston, 435 Mass. 718, 720 (2002) (holding that deferred compensation falls outside the scope of the statute).

Indeed, Massachusetts courts consistently hold that bonuses, including retention bonuses like the Commitment to Success Bonus at issue here, do not constitute "wages" within the meaning of the Weekly Payment Of Wages Law. See, e.g., Doucot v. IDS Scheer, Inc., 2010 U.S. Dist. LEXIS 80903, at *50-53 (D. Mass. Aug. 10, 2010) (Bowler, M.J.) (holding that a retention bonus did not constitute "wages" under the statute); Navisite, Inc. v. Cloonan, 2005 Mass. Super. LEXIS 408, at *39 (Mass. Super. Ct. May 11, 2005) (Billings, J.) (holding that a retention bonus and a performance bonus "lie well outside the statute's reach"); Manning v. Zoccaro, Mass. L. Wkly. No. 12-039-02 (Mass. Super. Ct. Feb. 21, 2002) (Donovan, J.) (holding that a retention bonus did not constitute "wages" under the statute). See also Sterling Research, Inc., 2005 U.S. Dist. LEXIS 31267, at *42 ("Generally, bonuses are not 'wages earned' within the meaning of" the statute); Baptista v. Abbey Healthcare Group, Inc., 1996 U.S. Dist. LEXIS 22797, at *12 (D. Mass. April 10, 1996) (Stearns, J.) ("there is no reason to extend the protections of [the statute] to cover bonuses potentially owing to highly paid executives"). These decisions are well supported by traditional principles of statutory interpretation.

First, the term "bonus" does not appear anywhere in the text of the Weekly Payment Of Wages Law.  See Doucot, 2010 U.S. Dist. LEXIS 80903, at *50.  In contrast, the statute does refer to salary, and specifically states that certain types of commissions fall within the scope of the law.  See Prozinski, 59 Mass. App. Ct. at 603 (holding that severance pay is not wages because "[a]lthough the statute expressly refers to holiday pay, vacation pay, and definitely determined commissions, it does not refer to 'severance pay' or similar terms"); Sterling Research, Inc., 2005 U.S. Dist. LEXIS 31267, at *47-48 ("The statute lists several specific types of compensation; stock is not one of them" and therefore stock awards are not wages under the statute).

Moreover, although the Legislature amended the statute to clarify that the term wages "shall include any holiday or vacation payments due an employee under an oral or written agreement," it has never amended the statute to include bonuses.  See Commonwealth v. Russ R., 433 Mass. 515, 521 (2001) ("a statutory expression of one thing is an implied exclusion of other things omitted from the statute").  Because a court may not add words to the Weekly Payment of Wages Law which the Legislature did not see fit to put there, the statute may not be construed to cover retention bonuses like the Commitment to Success Bonus.  See Okerman v. VA Software Corp., 69 Mass. App. Ct. 771, 777-78 (2007) ("We do not read into the statute a provision which the Legislature did not see fit to put there, nor add words that the Legislature had an option to, but chose not to include." (quoting Comm'r of Corr. v. Superior Court Dep't of the Trial Court., 446 Mass. 123, 126 (2006)).  See also, e.g., Gabovitch v. First Signs, Inc., 2008 Mass. App. Unpub. LEXIS 440, at *8 (Mass. App. Ct. May 14, 2008) ("Certain forms of compensation . . . are outside the scope of" the statute).

Second, the Weekly Payment Of Wages Law, like all statutes, must be interpreted "according to the intent of the Legislature . . . considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." Boston Police Patrolmen's Association, Inc., 435 Mass. at 719-20.  As noted above, the purpose of the statute is to prevent the unreasonable detention of wages. Id. at 720. The whole point of a retention bonus, however, is to **defer** payment until some later date when the bonus is earned.  There is nothing in the text of the Weekly Payment Of Wages Law, its legislative history, or the relevant case law which would suggest that the Legislature was concerned about, or intended to cover, deferred payments such as retention bonuses.  Indeed, the SJC reached this conclusion when it held that the "Legislature's remedy for the evil of unreasonable detention of wages [i.e., the weekly or regular payment of wages] is not applicable to deferred compensation" arrangements. Id. at 720.  Therefore, retention bonuses fall outside the scope of the Weekly Wage Act.[12]  Accordingly, the Court should grant DHL's motion for summary judgment with regard to Count I.

---

[12] This conclusion is buttressed by the provision of the Weekly Payment of Wages Law which requires that any employee discharged from employment "shall be paid in full on the day of his discharge."  Mass. Gen. Laws ch. 149, § 148.  If the statute governed compensation that was not due and payable until some future event, "this provision would mean that the entirety of these monies would need to be paid at the time of discharge, even if the monies would not otherwise become due for six months." Kittredge v. McNerney, 2004 Mass. Super. LEXIS 185, at *8-9 (Mass. Super. Ct. May 7, 2004) (Gants, J.).  The Legislature, in enacting the Weekly Payment of Wages Law, could not have intended to impose treble damages on employers who discharge an employee and then fail to pay such employee the balance of a retention bonus – to which the employee is not yet even entitled under the existing bonus plan – on the date of discharge. Id.

### 2.     DHL did not violate the Weekly Payment of Wages Law.

The Commitment to Success Bonus Plan clearly states that employees who are terminated for "good cause," such as Weiss, are not eligible to receive the bonus. Thus, DHL's decision not to pay Weiss did not violate the Weekly Payment of Wages Law.[13]

Although the Commitment to Success Bonus Plan does not define the term "good cause," Massachusetts courts have a well-established definition for the term "good cause" in this context. See Klein v. President & Fellows of Harvard College, 25 Mass. App. Ct. 204, 208-09 (1987). Under this definition, the term good cause means: (1) a "reasonable basis for employer dissatisfaction" with an employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to reasonable standards of conduct, or other inappropriate behavior; or (2) grounds for discharge reasonably related, in the employer's honest judgment, to the needs of his business. See id. at 208; Goldhor v. Hampshire College, 25 Mass. App. Ct. 716, 722-24 (1988). DHL's actions plainly satisfy this standard.

As discussed above, DHL clearly had reason to be dissatisfied with Weiss's mishandling of the June 2007 meeting with Garcia. Although Garcia's misbehavior could have resulted in termination, Weiss chose not to investigate the matter, not to document the warning he gave Garcia (a clear violation of DHL policy), and not to notify human resources or security of Garcia's actions. (SMF ¶¶ 66-74, 83-87). To make matters worse, Weiss never followed up to determine whether Garcia actually corrected the problem with the Madden account. (SMF ¶ 88). In the face of these findings – all of

---

[13]  Because the Commitment to Success Plan gives DHL "full power and discretionary authority to interpret the Plan [and] make factual determinations" related to the administration of the plan, the Court's review of DHL's decision is relatively limited in scope. (SMF ¶ 30). Specifically, the Court only "may perform a limited review of the decision to determine if it was arbitrary, capricious, or made in bad faith." Noonan v. Staples, Inc., 556 F.3d 20, 33-34 (1st Cir. 2009).

which came from an independent, outside law firm – DHL clearly had good cause to terminate Weiss. (SMF ¶¶ 91-92). Thus, Weiss cannot prevail on his claim under the Weekly Payment of Wages Law and, therefore, the Court should enter summary judgment for DHL.

### B.   Weiss Cannot Prevail On His <u>Fortune</u> Claim Because He Has No Evidence Of "Bad Faith" On The Part Of DHL

Weiss next alleges that DHL's "failure to pay [him] the promised bonus and severance violates the covenant of good faith and fair dealing inherent in the parties' employment relationship." To prevail on this theory, which was first recognized in <u>Fortune v. National Cash Register Co.</u>, 373 Mass. 96 (1977), Weiss must establish that: (1) he was an at-will employee; (2) he was terminated; (3) the termination was in "bad faith;" and (4) DHL was unjustly enriched by depriving him of compensation he already had earned or was on the brink of earning. <u>See</u> <u>Harrison v. NetCentric Corp.</u>, 423 Mass. 465, 472-73 (2001); <u>Gram v. Liberty Mut. Ins. Co.</u>, 384 Mass. 659, 672 (1981). Weiss's <u>Fortune</u> claim fails for a number of reasons.

### 1.   There is no evidence that DHL terminated Weiss to avoid paying him severance or a bonus.

To establish the "bad faith" element of his <u>Fortune</u> claim, Weiss must show that DHL terminated his employment "without good cause" and for the purpose of depriving him of a bonus and/or severance to which he was entitled. <u>Cort v. Bristol-Myers Co.</u>, 385 Mass. 300, 303 (1982). <u>See</u> <u>Michelson v. Digital Fin. Servs.</u>, 167 F.3d 715, 726 (1st Cir. 1999) ("in order to succeed on this claim, Michelson must prove that DFS terminated him without good cause and in bad faith in order to deprive him of commissions"); <u>Coll v. PB Diagnostic Sys.</u>, 50 F.3d 1115, 1125 (1st Cir. 1995). Weiss cannot establish either of these elements of "bad faith."

First, DHL clearly had good cause to terminate Weiss's employment. As discussed, Weiss failed to discover that Garcia was engaged in fraudulent rate activity while he was responsible for District 117. Moreover, when Weiss became aware of Garcia's activity, he failed to: (a) investigate the scope and nature of Garcia's actions; (b) document the warning he gave to Garcia (thereby violating Company policy); (c) notify DHL's human resources or security departments; and (d) follow up to determine whether Garcia had corrected the rates for the account in question. (SMF ¶¶ 66-74, 83-88, 91-92).

Second, Weiss has not come forward with *any* evidence that DHL characterized his termination as being for just cause in order to preclude him from receiving a bonus or severance. See York v. Zurich Scudder Invs., Inc., 66 Mass. App. Ct. 610, 616 (2006) ("bad faith is not established where there is no evidence that an employer was motivated by improper reason, even though an employee's termination may be bad, unjust, and unkind . . . contrary to his reasonable expectations, and the product of inadequate investigation") (internal citations and punctuation omitted). Instead, Weiss speculates that because DHL was not performing well financially at the time of his termination, the Company must have decided to label his termination as being for just cause in order to save money. This kind of rank, unfounded speculation is inadequate to create a genuine dispute of material fact, particularly given that Berger, the individual who made the decision to terminate Weiss, testified at deposition that the issue of Weiss's bonus was never discussed during the deliberations that lead to his termination. (SMF ¶ 93). See Medina-Munoz, 896 F.2d at 8.

> **2.      Weiss cannot state a <u>Fortune</u> claim based on compensation
> that is tied to future services.**

To the extent Weiss's <u>Fortune</u> claim is based on the Commitment to Success

Bonus, DHL is entitled to judgment as a matter of law because he had not earned the

remainder of that bonus.  The law clearly distinguishes between losses of earned wages

for past services, which are recoverable under <u>Fortune</u>, and the loss of wages attributable

to future services, which are not recoverable.  <u>See, e.g.</u>, <u>McCone v. New England Tel. &</u>

<u>Tel. Co.</u>, 393 Mass. 231, 234-35 (1984); <u>Gram v. Liberty Mut. Ins. Co.</u>, 391 Mass. 333,

336-37 (1984); <u>Michelson</u>, 167 F.3d at 726.  "The <u>Fortune</u> doctrine does not protect

interests contingent on an event that has not occurred."  <u>Harrison</u>, 433 Mass. at 475.

In this case, Weiss had not earned the remaining Commitment to Success Bonus.

Under the terms of the plan, he had to remain employed with, and continue providing

services to, DHL until January 2010 to earn the remaining bonus.  Thus, the remaining

bonus was based on his future service to DHL.  Accordingly, he cannot recover that

bonus under <u>Fortune</u>.  <u>See, e.g.</u>, <u>Barton v. Brassring, Inc.</u>, 2006 Mass. Super LEXIS 549,

at *17 (Mass. Super. Ct. Oct. 26, 2006) (MacLeod-Mancuso, J.) (holding that plaintiff

could not state a <u>Fortune</u> claim where the bonus in question "was not compensation for

particular services already provided, but was contingent on Plaintiff's continued

employment"); <u>Goldstein v. PFPC Worldwide, Inc.</u>, 2004 Mass. Super LEXIS 22, at *9-

10 (Mass. Super Ct. Feb. 19, 2004) (Connolly, J.) (holding that a stay bonus did not give

rise to a <u>Fortune</u> claim because it "was not for a clearly identifiable future compensation

reflective of the employee's past services"); <u>Aggarwal v. Nexabit Networks, Inc.</u>, 2001

Mass. Super. LEXIS 650, at *23 (Mass. Super. Ct. June 1, 2001) (Burnes, J.) ("Where

benefits such as shares of stock are subject to a vesting schedule over time and vest only

if the employee continues to be employed, such benefits are contingent on the employee providing future services for the employer and thus generally are not compensation for past services."). Accordingly, DHL is entitled to summary judgment on this claim.

> **3.      Weiss has not articulated any basis for his severance pay claim.**

Weiss also seeks to recover severance pay under the <u>Fortune</u> doctrine. This claim fails because Weiss has not articulated any basis for his claim that he had earned or otherwise was entitled to receive severance pay.[14] Indeed, at deposition Weiss conceded that no one at DHL ever promised him severance pay. (SMF ¶ 95). Instead, he suggests that DHL had a general practice of paying severance to employees who were laid off in connection with a reduction in force. Any such practice is irrelevant here, given that Weiss was terminated for good cause based on his documented management failures vis-à-vis Garcia. (SMF ¶¶ 92, 96). Accordingly, the Court should grant DHL's motion for summary judgment.

> **C.      Plaintiff Cannot State A Claim For Detrimental Reliance**

In Count III, Weiss alleges that he relied to his detriment on DHL's promise to pay him a Commitment to Success Bonus. To prevail on this claim, Weiss must prove each of the following elements: (1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representations is made; (2) a reasonable act or omission by the person to whom this representation was made resulting from the representation; and (3) detriment suffered by the person to whom the representation was made as a result of the act or omission.

---

[14] Shortly before Weiss's termination, DHL enacted a severance pay plan for employees at the level of director. Weiss does not appear to allege that he is entitled to severance under this plan. To the extent Weiss now argues that he is entitled to severance under this plan, DHL reserves its right to argue, among other things, that (a) Weiss's claims are preempted by the Employee Retirement Income Security Act, (b) Weiss was not eligible for severance under the terms of the plan, and (c) Weiss failed to comply with the administrative prerequisites to receiving severance under such plan.

Loranger Constr. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 760 (1978). See Upton v. JWP Businessland, 425 Mass. 756, 760 (1997) ("an at-will employee asserting estoppel [must] show that she reasonably relied on an unambiguous promise."). Weiss cannot meet this test.

First, any "promise" to pay the Commitment to Success Bonus was contingent upon Weiss's continued employment in good standing through January 2010. DHL expressly informed Weiss that he would not be eligible to receive a bonus if he was terminated for good cause prior to the payout date. Thus, DHL simply acted in accordance with its "promise," and Weiss's various acts of mismanagement with regard to Garcia and District 117 excused DHL from having to pay him the remaining bonus. See G.M. Abodeely Ins. Agency, Inc. v. Commerce Ins. Co., 41 Mass. App. Ct. 274, 278 (1996); Ward v. American Mut. Liability Ins. Co., 15 Mass. App. Ct. 98, 100 (1983) ("It is well established that a material breach by one party excuses the other party from further performance under the contract.").

Second, Weiss cannot establish that he experienced a "detriment" as a result of his decision to remain employed with DHL. He received an annual salary of $143,500, as well as incentive compensation, during the last few years of his employment with DHL. (SMF ¶¶ 17-18, 25). Although Weiss alleges that he decided to remain at DHL in reliance on DHL's "promise" to pay him a Commitment to Success Bonus, he has not identified any potential job opportunities that he chose to forego and for which would have received more compensation than he received from DHL. Thus, Weiss cannot state a claim for detrimental reliance. Therefore, summary judgment should enter for DHL on this claim.

### D.    Weiss Cannot Prevail On His Unjust Enrichment Claim Because DHL's Decision To Terminate Him Was Justified

Weiss alleges that DHL was "unjustly enriched" by its decision not to pay him severance or the remaining $60,000 Commitment to Success Bonus.  Compl. ¶¶ 51-54. To prevail on this claim, Weiss must show: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law.  See In re Lupron Mktg. and Sales Practices Litig., 295 F. Supp. 2d 148, 182  (D. Mass. 2003).  Weiss's claim fails because, as discussed at length above, DHL plainly had "justification" to characterize his termination as being for just cause.  Moreover, because Weiss's other legal claims provide him with the potential means to recover the value of his remaining bonus, and an award of severance pay, he cannot pursue an unjust enrichment claim.  See id.

### III.    CONCLUSION

For the reasons discussed above, there are no genuine disputes of material fact and DHL is entitled to judgment as a matter of law on all of Weiss's claims.  Therefore, the Court should grant DHL's motion for summary judgment and dismiss this case in its entirety.

Respectfully submitted,

DHL EXPRESS, INC.

By its attorneys,


/s/ Christopher B. Kaczmarek
Christopher B. Kaczmarek
(BBO No. 647085)
LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA  02110
Phone 617.378.6000
Fax 617.737.0052
Dated:  March 15, 2011          ckaczmarek@littler.com


## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 2011, a true and accurate copy of the foregoing document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ Christopher B. Kaczmarek
Christopher B. Kaczmarek


Firmwide:100602717.1 047975.1054