UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **JEREMY M. WEISS** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:10-cv-10705-NG |
| **DHL EXPRESS, INC.** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AFFIDAVIT OF JEREMY WEISS

1. My name is Jeremy Weiss and I am the Plaintiff in this action.
2. I submit this Affidavit in support of my opposition to DHL's Motion for Summary Judgment. There are disputed issues of fact and material facts adverse to DHL. The purpose of this Affidavit is to explain the facts from my perspective.
3. I am a graduate of the University of Vermont. I graduated with a B.S. in Business Administration in 1995. I went to work for Airborne Express in 1996.
4. Airborne Express transported small packages primarily in the United States.
5. DHL's business at the time consisted primarily of transporting small packages internationally.
6. Michael Berger, the man who fired me, was Airborne Express' Regional Sales Manager in 1999. I was the Syracuse District Sales Manager.

7. In 2000 I became District Sales Manager for Airborne Express in Boston. This was a promotion as Airborne classified District Sales Managers according to the volume of business and number of people in a particular market. Syracuse was a District 4. Boston was District 3. Michael Berger was responsible for that promotion.

8. In 2003 DHL acquired Airborne Express. Following the acquisition District Sales Managers, like myself, were required to interview for our jobs. Some were let go. Under DHL I retained the position Boston District Sales Manager. I reported to Regional Sales Director Jon Routledge who, in turn, reported to David Katz, DHL vice president of sales in charge of Area 4.

9. In late 2005 I was promoted to Regional Sales Director. Dave Katz was responsible

for that promotion. In that capacity I was responsible for eight districts: North Shore of Boston; Downtown Boston; Hartford CT; Norwalk CT; Danbury CT; Westchester NY; Brooklyn & Queens; and Long Island.

for that promotion. In that capacity I was responsible for eight districts: North Shore of Boston; Downtown Boston; Hartford CT; Norwalk CT; Danbury CT; Westchester NY; Brooklyn & Queens; and Long Island.

10. My region was one of four (4) DHL regions in Area 4. Geographically Area 4 consisted of the northeastern United States as far south as New Jersey and as far west Detroit.

11. In May 2006 I received an M.B.A. from Babson College. I had commenced the M.B.A. program prior to DHL's acquisition. Airborne Express had a tuition reimbursement program that offered approximately $2000 per year to employees who pursued educational degrees. Airborne Express contributed 60% of the cost of my M.B.A. program while I was an Airborne Express employee. After the acquisition of Airborne by DHL, DHL continued to contribute 60% of the cost of my M.B.A. program. In all, Airborne and DHL contributed more than $35,000 toward my M.B.A. degree.

12. I received consistently positive performance evaluations from my managers Dave Katz, Jon Routledge and Michael Berger. Copies of my performance evaluations for the years 1999, 2000, 2003, 2004, 2005, 2006, 2007 and 2008 are attached as Exhibit A. In 2006 my region was the top region in the Company and I won the President's Club Gold. In December of 2008 I was selected by DHL to be part of 21 day world tour of DHL facilities. Only 6 or 7 employees participated on this tour of London, Brussels, Amsterdam, Frankfurt, Bahrain, Hong Kong, Shanghai and Tokyo.

13. I never received any discipline (including verbal warnings and coaching and counseling sessions) during my tenure as an Airborne Express and DHL employee.

14. In early 2007 Area 4 was expanded from four (4) regions to five (5) regions within the same geographical area. As part of this restructuring the New England region and the lower Hudson (i.e., New Jersey and Manhattan) region gave up districts to form a new, New York City region. Chris Cadigan became the Regional Sales Manager for that region.
15. The districts of Brooklyn & Queens and Long Island were moved out of my region as part of this restructuring.

16. As Regional Sales Director I was responsible for hiring salespeople, for the development of salespeople and for growing my portion of the business in accordance with Company goals.
17. Each district in my region had a District Sales Manager. The District Sales Manager for Brooklyn while Brooklyn was in my region was a man named Mike Gargiles. There were approximately six sales representatives in the Brooklyn district also referred to as District 117.
18. DHL established revenue targets for its districts. District 117 generally met or exceeded the revenue growth targets established by DHL. DHL was concerned that I assist under performing districts in my region. District 117 was not such a district. DHL conferred awards on District 117's Sales Manager and certain District 117 sales representatives including a sales representative named Sergio Garcia.

19. DHL had a commission program for its sales employees that rewarded revenue as

opposed to profitability. DHL's incentive program encouraged the sales employees to maximize revenue even when the revenue was generated by such low rates that DHL did not earn profit on the transaction. This structural problem resulted in sales people obtaining the lowest possible (i.e., discounted) rates in order to maximize revenue even at the expense of the Company's bottom line. This is not just my opinion. The TWG Report concluded that "DHL's failure to base commissions, at least in part, on the profitability of those accounts contributed to the environment where these rogue sales representatives were incentivized to circumvent DHL's policies and procedures". TWG Report at 50.

20. Price is a major consideration for most customers. Most rates given to DHL customers needed to be approved by the pricing department. Certain low volume rates were available to sales representatives without approval from the pricing department. These were not discounted rates. All DHL rates needed to be set up through the pricing department for each customer. Thus a sales representative, in order to assign a discounted rate to a customer, went through the pricing department for approval and set up. Sales representatives themselves could not unilaterally approve rates or alter rates. The pricing department needed to be involved in that process.

21. As Regional Sales Director I was primarily concerned with customer satisfaction. If customers had problems that were not resolved between the sales representative and the District Sales Manager I would get involved.

22. An example of a customer problem arose in 2007 after I no longer had responsibility for District 117. Chris Cadigan was then the Regional Sales Director for District 117. The customer was a shoe manufacturer named Steve Madden. The customer was frustrated and confused about their billing. The problem was occasioned by District 117 sales representative Sergio Garcia who had incorrectly set up the Steve Madden account. The way the account was established required the customer to understand the different account numbers rather than simply selecting the type of service.

23. In a conference call among myself, Chris Cadigan, Dave Katz and Mike Gargiles Cadigan and Katz discussed the Steve Madden problem. We discussed our concern for the customer, our need to resolve the billing issue and the need to speak to Garcia about it. As I had reason to be in Long Island with another customer I offered to speak with Garcia.

24. The Steve Madden billing issue was not an isolated occurrence for DHL. At one point DHL had $100,000,000.00 in unapplied cash that had been received from customers that the company could not figure out how to apply. This became a huge problem both because some customers had actually paid their bills and not been credited with the payment by the company and also because other customers claimed to have paid and demanded that the unapplied cash be applied to their invoices.

25. I spoke to Sergio Garcia on June 25, 2007 in the break room at the Brooklyn facility in the presence of District Sales Manager Gargiles. I told Garcia that he had created a problem for a customer and that DHL cannot put its customers in a position where they are confused about their billing rates. I instructed him to go back and adjust the problem so that the customer was satisfied that he knew and understood his billing arrangement.

26. During our conversation Garcia said nothing about me being connected in any way with the account set up.

27. I did not understand from Cadigan that the problem had been longstanding. It had not been brought to my attention while District 117 was in my region.

28. Cadigan never told me that Garcia had blamed me for the Madden problem.

29. I did not assist Garcia setting up any customer accounts, including the Steve Madden.

30. The document the Company refers to as a 'handbook for managers' was never distributed to me or, to my knowledge, other managers.

31. No one instructed me that a supervisor should document a verbal warning in the employee's department file. Garcia's department file was maintained by his District Sales Manager.

32. To my knowledge there never has been a requirement that a verbal warning be communicated to Human Resources or Security. Security, to my knowledge, was responsible for locating stolen laptops, foreign currency and matters involving theft. Failing to notify Human Resources or Security of my conversation with Garcia hardly constitutes good cause for my termination.

33. In December 2007 the Company promised me a total payment of $80,000.00 if I continued to perform my duties for the Company until December 31, 2009. At that time I accepted the offer I consciously decided not to pursue the leads from placement consultants about alternative positions. I understood that payments to other DHL executives were made at the same time because the Company was about to undergo substantial reductions in force.

34. I subsequently learned that approximately 100 employees were promised these retention bonuses and that some 30,000 U.S. employees were laid off between January 2008 and the end of 2010 leaving a domestic workforce of about 3500 employees.

35. In October 2008 the Company eliminated the performance aspect of the "Commitment to Success" program. The terms of the program now made clear that if I remained employed until December 31, 2009 I would receive the entire sum of $80,000.00. The program also made it clear that if the Company terminated my employment prior to December 31, 2009 I was entitled to be paid the entire sum upon termination of employment unless the Company had cause to fire me.

36. In January of 2009 I received 25% of the "Commitment to Success" payment.

37. In April of 2009 a customer by the name of Andy Matthews from a co-loader customer named Source Link contacted me to try to obtain lower rates. He protested that a competitor of his had lower rates than he had. He also threatened to go to the F.B.I. because one of our sales employees was receiving kickbacks from his competitor. I felt he was attempting to extort lower rates from the Company. I

explained that his rates were proper. I immediately reported the substance of his call to my superiors and forwarded his email to my superiors.

38. The Andy Matthews call resulted in the resignation of Sergio Garcia later in April and the Company's retention of a law firm to conduct an investigation. Ironically, the Company felt justified in depriving me of earned compensation as a consequence of these events.

39. DHL terminated my employment on September 2, 2009. The decision was communicated to me by Michael Berger. I was taken completely by surprise. I demanded an answer to the question "why". Berger was unable or unwilling to give me a straight answer, advising me at the time that the CEO Ian Clough had made the decision. At his deposition Berger took responsibility for the termination recommendation. He did not do that when I spoke with him.

40. I understand the company had the right to terminate my employment as I was an at will employee. The Company specifically promised me that it would pay me an additional $60,000.00 if I remained a loyal employee from January 2008 through the end of 2010. I upheld my end of the bargain. The Company did not uphold its end of the bargain.

41. The company's characterization of my termination as for "cause" had no impact other than to deprive me of the $60,000.00 retention payment and six (6) months of severance worth approximately $73,650.00.

42. While I worked for DHL I was under the impression that employees, including myself, were entitled to severance when the separated from employment. Following my termination, as part of the discovery in this lawsuit, the Company made available to me a Director's Severance Plan adopted shortly before my termination. A copy of that Plan is attached as Exhibit B.

43. Shortly after I was fired I retained an attorney who made a written demand on the Company for both the retention payment and the severance payment. The attorney's letter is attached hereto as Exhibit C.

**SUBSCRIBED AND AFFIRMED PURSUANT TO THE PAINS AND PENALTIES OF PERJURY THIS 2ND DAY OF APRIL 2011.**

_____
Jeremy Weiss