UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JEREMY M. WEISS, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) | Civil Action No. 10-10705-NMG |
| DHL EXPRESS, INC., | ) ) ) | |
| Defendant. | ) ) | |

REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

November 16, 2011

SOROKIN, M.J.

Currently pending is the Motion for Summary Judgment of Defendant DHL Express, Inc. (Docket # 13).

For the following reasons, I RECOMMEND that the Court ALLOW DHL's Motion for Summary Judgment (Docket # 13) with respect to the statutory claim advanced in Count I, and DENY the motion with respect to the contract claims advanced in Counts II through IV because each of those counts presents a genuine dispute of material fact for resolution by a jury.

I. FACTUAL AND PROCEDURAL BACKGROUND

Weiss has brought four claims against DHL relating to his September 2, 2009, termination (ostensibly resulting from his failure to discover the misconduct of employees under his supervision and to properly investigate, document and ameliorate such misconduct). Docket # 1-

1

1.

Count I is for violation of M.G.L. c. 149, § 148 (the Wage Act), in which Weiss alleges that he was terminated from his employment with DHL without just cause, and that DHL wrongfully failed to pay to him a $60,000.00 retention bonus. Id. at ¶¶ 38-42. Count II is for violation of the covenant of good faith and fair dealing, for failure to pay both the retention bonus and a severance package. Id. at ¶¶ 43-44. Count III is a contract claim for detrimental reliance, alleging that DHL's promise of a retention bonus was intended to induce Weiss to continue his employment, which he did to his detriment, and which promise DHL then breached. Id. at ¶¶ 45-49. Count IV is for unjust enrichment, and alleges that DHL enjoyed the benefit of Weiss's services and the denial of the retention bonus and severance package violates fundamental principles of justice and equity. Id. at ¶¶ 50-53. Weiss seeks to recover the retention bonus DHL denied him (trebled under the relevant statutory authority), six months severance pay, costs and fees. Id. at 10.

In 1996, Weiss began working for Airborne Express (subsequently acquired by DHL in 2004).[1] Docket # 15 at ¶¶ 10, 11. Airborne Express was in the business of transporting small packages domestically. Id. at ¶ 4. During the course of his career, Weiss held positions of increasing responsibility, advancing from a District Sales Manager in 1999, to Regional Sales Director by 2005, and Director of National Accounts by 2007. Id. at ¶¶ 13-16, 24. Id. at ¶ 17. As a Regional Sales Director, Weiss was responsible for managing multiple sales districts. Id. at

---

[1] Weiss disputes the date of the acquisition (and thus of his employment by DHL). Docket # 23 at ¶ 11 (citing Docket #15-4 at 5). The citation, however, does not support the factual assertion (either in the pagination of the Court's docketing system, or the internal pagination of the exhibit) and the dispute is any event not material to the motion.

¶ 16. From the end of 2005 until June of 2007, Weiss's territory included Brooklyn, New York, a sales district known internally as "District 117." Id. at ¶ 20.

The Bonus Plan

In December 2007, DHL informed Weiss that he had been selected to participate in the Company's "Commitment to Success Bonus Plan." Id. at ¶ 26. Under the Plan, Weiss could potentially receive a $60,000 service-based bonus and a $20,000 performance-based bonus. Id. at ¶ 27. The Plan provided that to be eligible to receive either bonus, Weiss had to be employed by DHL on the date of payment. Id. at ¶ 28. The Plan provided that DHL reserved the "right to amend, or terminate the Plan at any time." Id. at ¶ 29.

In October 2008, DHL notified Weiss that it had modified the terms of the Plan so that henceforth, payouts would be based solely on "continued employment to the company with performance remaining in good standing." Id. at ¶¶ 31-32. Under the amended Plan, Weiss was eligible to receive twenty-five percent of the $80,000 Commitment to Success Bonus in January 2009, and to receive the remaining seventy-five percent in January 2010. Id. at ¶ 33. DHL informed Weiss that if his position were eliminated or if he were terminated without cause, he would receive the full amount of the Commitment to Success Bonus. Id. at ¶ 34. DHL informed Weiss that if Weiss voluntarily left DHL or if he were "terminated for good cause prior to the payment dates, you are not eligible for the Commitment to Success payout." Id. at ¶ 35; Docket # 15-2 at 123. DHL paid Weiss $20,000, the first installment of his Commitment to Success Bonus, in January 2009. Docket # 15 at ¶ 36.

The Investigation

DHL employed Sergio Garcia as a sales representative in District 117 during the time

3

period in which Weiss was responsible for that District (i.e., from the end of 2005 to early 2007) and afterwards. Docket # 15 at ¶ 38; Docket # 24 at ¶¶ 14-15. In 2009, DHL received a complaint from a customer alleging that Garcia (then working in another district) had required the customer to pay a kickback in exchange for receiving a preferential shipping rate. Id. at ¶ 39. In its initial correspondence, the customer repeatedly threatened to contact the FBI and the media with its allegations. Docket # 16 at 12.

In April, 2009, DHL retained a law firm, Thompson, Wigdor and Gilly, LLP ("TWG") to investigate the kickback allegations. Docket # 15 at ¶ 40. Among its findings, TWG reported to DHL that Garcia and other sales representatives in District 117 had also engaged in various improper sales practices during the preceding years, when Weiss was their supervisor. Id. at ¶¶ 45, 48-49.[2] TWG reported that sales representatives had bypassed DHL's procedures for establishing customer billing rates. Id. at ¶ 48.

Specifically, TWG informed DHL that, in late 2006 or early 2007, Garcia had improperly established shipping rates for a customer named Steve Madden. Id. at ¶ 52.[3] TWG reported that Garcia manipulated the Company's systems to create the appearance that Madden was affiliated with existing customers who were eligible to receive very low shipping rates. Id. at ¶ 58. TWG

---

[2] Weiss does not dispute that TWG provided the information recited here and below to DHL, but the Court notes that he often disputes the accuracy of the underlying information relayed.

[3] Weiss disputes the assertion that TWG found that the rates Garcia set up for Madden were improper. See Docket # 23 at 6 ("the report does not indicate that Garcia did anything improper at the time he set those accounts up"). There is no genuine dispute on this point. The Report, in a section entitled "Prior Evidence of Improper Sales Practices in District 117" states "Garcia was found to have engaged in improper rate extensions and account set-up related to accounts for customer Steve Madden, the footwear company, that he set up in late 2006 or early 2007." Plainly, TWG found and reported this information.

4

reported that Garcia told another DHL manager, Chris Cadigan, that Weiss had been involved in the improper set up of the Steve Madden account (a fact which TWG reported Weiss had denied, and which TWG was unable to corroborate). Id. at ¶¶ 53-55.[4]

In about June 2007, Weiss was informed that Garcia had not set up the rates for the Madden account properly. Id. at ¶ 62. Weiss's understanding was that Garcia had established the account in a manner that required the customer to understand the different DHL account numbers rather than simply selecting the type of service, with the result that the customer was confused and frustrated about its billing. Docket # 24 at ¶ 22. Weiss was at that time a Regional Sales Director, but District 117 had recently come under the supervision of another Regional Sales Director, Cadigan, due to a DHL restructuring. Id. at ¶¶ 14-15. The District Sales Manager for District 117 (both during Weiss's supervision of that district as well as in June, 2007) was Mike Gargiles. Id. at ¶ 17. In a conference call, Weiss, Cadigan, Gargiles, and the Vice President of Sales, Dave Katz, discussed the need to resolve the billing issue raised by Madden and the need to speak to Garcia. Id. at ¶ 23. Weiss offered to speak to Garcia because he had reason to be nearby in the course of speaking with another customer. Id.

On June 25, 2007, both Weiss and Gargiles met with Garcia for between ten and fifteen minutes. Docket # 15 at ¶¶ 63-65; Docket # 25 at ¶ 25.[5] During the meeting, Weiss told Garcia that his behavior could result in disciplinary action, including termination. Docket # 15 at ¶ 66.

---

[4] At the hearing on this motion, DHL disclaimed any reliance in terminating Weiss upon a conclusion that Weiss was himself involved in any of Garcia's misconduct.

[5] Also at the hearing on this motion, DHL conceded that Gargiles was present at the June 25th meeting. Weiss conceded that he had warned Garcia that his conduct could lead to discipline, including termination.

5

Weiss instructed Garcia to work with DHL's pricing department to correct the pricing on the Madden account.  Id. at ¶ 67.  TWG informed DHL that Weiss did not ask Garcia how he was able to bypass DHL's rates procedures or whether he had engaged in similar conduct with regard to other accounts, whether any other employees were involved in setting up the Madden account, or whether he was aware of similar actions by other sales representatives.  Id. at ¶¶ 68-70, 72-73.  Weiss did not himself investigate any of Garcia's other accounts.  Id. at ¶ 71.

DHL's handbook for managers (which Weiss denies receiving) states that verbal warnings "should be documented and retained in the department employee file."  Id. at ¶ 85.  TWG informed DHL that Weiss did not inform DHL's Human Resources or Security departments of the warning he gave to Garcia or of Garcia's misconduct, and that he also did not document the warning he gave Garcia.  Id. at ¶ 86.  TWG also reported that Weiss acknowledged that if the sales representatives in District 117 were engaged in the improper conduct TWG described, he "should have uncovered" the wrongdoing.  Id. at ¶ 89.

TWG also reported to DHL that in September 2007, Weiss's successor in managing District 117, Cadigan, along with another Vice President of Sales Jon Routledge (apparently Katz's successor) discovered that three sales representatives in District 117 had engaged in similar improper sales practices.  Id. at ¶ 74.  Cadigan did not identify any misconduct by Garcia at that time.  Docket # 16 at 26.  The three accused sales representatives resigned rather than face disciplinary action.  Docket # 15 at ¶ 75.  Two of these sales representatives identified Garcia as the person who had taught them how to circumvent DHL's procedures regarding the proper establishment of rates.  Id. at ¶ 76.  As a result of these findings, DHL demoted Gargiles (whom TWG later characterized as "the [District Sales Manager] with direct responsibility for all the

6

rogue sales representatives"). Id. at ¶ 77; Docket # 16 at 31. Garcia received a three-day suspension (which DHL's Human Resources apparently rescinded as having been unauthorized because it was imposed without their involvement) and then was transferred to another sales district where he engaged in further misconduct. Docket # 16 at 28-29. TWG informed DHL that Cadigan believed that Weiss should have known about the problems in District 117. Docket # 15 at ¶ 79. TWG's report states that Cadigan blamed Weiss for the "mess" that Cadigan inherited and had to clean up in District 117. Id. at ¶ 80.

TWG also informed DHL that Garcia engaged in misconduct in 2008, which it believed included kickback schemes, which it faulted Routledge for failing to uncover. TWG concluded that "sales managers who failed to act in the manner that would be expected of a person employed in their position" included seven individuals (Weiss, Katz, Routledge, Cadigan, Steven Berger (the Regional Sales Director in the district to which Garcia was transferred following the September 2007, investigation) and Dave Stewart (the District Sales Manager overseeing Berger). Docket # 16 at 14.

In the summer of 2009, DHL's in-house legal counsel (John Olin), CEO (Ian Clough) and Vice President of Sales (Michael Berger) held a number of meetings to discuss TWG's findings. Id. at ¶ 90.[6] TWG informed DHL that it was exposed to potential criminal liability as a result of Garcia's actions, and urged DHL to "take appropriate action" to lessen DHL's potential liability.

---

[6] Weiss disputes that there were any TWG findings for these men to discuss at that time because TWG's written report did not issue until the day after his termination. Michael Berger's testimony makes clear, however, that he was briefed by Clough and Olin throughout the course of the investigation, whether or not TWG's findings were at that point in writing. Docket # 15-3 at 28-31; Docket # 15-4 at 35-37. There is no evidence disputing DHL's evidence that it received information from TWG orally before it received the written report.

7

See Docket # 16 at 64-65. In August 2009, Clough sought Berger's recommendation with regard to Weiss. Docket # 15-4 at 47. Based on TWG's findings, Berger recommended that DHL terminate Weiss's employment for "just cause." Id. Because Weiss was (in DHL's view) terminated for just cause, DHL did not consider paying him severance. Docket # 15-4 at 38. DHL terminated Weiss's employment on September 2, 2009. DHL also terminated Steven Berger and Cadigan as a result of TWG's findings. Docket # 15 at ¶ 100. DHL classified the terminations of Berger and Cadigan as being for "just cause." Id. at ¶ 101. Because these individuals were terminated for "just cause," DHL did not provide them with any severance pay. Id. at ¶ 102. Routledge resigned prior to the conclusion of the investigation. Docket # 16 at 7. Katz does not appear to have been terminated,[7] although TWG told DHL that both Katz and Routledge, "were aware of Garcia's misconduct, yet failed to take appropriate action." Id. at 53.

Weiss filed suit in state court on February 4, 2010. Docket # 1-1 at 3. DHL removed the case to this Court on April 27, 2010, asserting in part that this Court's federal question jurisdiction was supported by the fact that Weiss's state law claims for severance were preempted by the Employee Retirement Income Security Act of 1974 (ERISA). Docket # 1 at 2. On March 15, 2011, DHL timely filed its Motion for Summary Judgment. Docket # 13.

II.   DISCUSSION

DHL asserts that there are no material facts in dispute and that it is entitled to judgment as a matter of law: because Weiss was terminated for cause, which it asserts defeats each of his claims; because there is no competent record evidence of bad faith by DHL; and because the

---

[7] Katz's fate is uncertain on the record before the Court. TWG's report notes that he declined to be interviewed, and a fair inference is that he was by the time of the investigation no longer employed by DHL. Docket # 16 at 8.

Wage Act is, in any event, inapplicable to retention bonuses.

Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir.1995)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Moreover, the Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir.1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir.2009).

Count I - the Wage Act Claim

Count I of the Complaint is a statutory claim pursuant to the Massachusetts Weekly Wage Act, M.G.L. c. 149, § 148, which provides in relevant part that

> Every person having employees in his service shall pay . . . each such employee the wages earned by him . . . any employee discharged from such employment shall be paid in full on the day of his discharge.

M.G.L. c. 149, § 148.

To state a claim under the Massachusetts Weekly Wage Act, Weiss must prove (1) he was an employee under the statute, (2) his deferred compensation constitutes a wage under statute, and (3) the defendants violated the statute by not paying him his wages in a timely manner. Doucot v.

IDS Scheer, Inc., 734 F.Supp.2d 172, 192 (D.Mass.2010) (Bowler, M.J.) (citing Stanton v. Lighthouse Fin. Servs., Inc., 621 F.Supp.2d 5, 10 (D.Mass.2009) (citing Allen v. Intralearn Software Corp., 2006 WL 1277813 at *1 (Mass.App.Ct. Apr. 24, 2006))).

DHL does not dispute that Weiss was its employee within the meaning of the statute. It asserts, however, that the retention bonus at issue does not constitute "wages." Docket # 14 at 10 ff. The purpose of the Massachusetts Legislature in enacting Section 148 Act was to limit "the interval between the completion of a work week and the payday on which the wages earned in that week will be paid." Doucot, 734 F.Supp.2d at 192 (citing American Mut. Liab. Ins. Co. v. Comm'r of Labor & Indus., 340 Mass. 144 (1959)). Massachusetts courts have construed the statute narrowly. Id. (citing Commonwealth v. Savage, 31 Mass.App.Ct. 714 (1991) ("[f]rom the caption to that act and from the placement of the provison [sic] in the weekly payment statute, one infers a Legislative purpose to assist employees who would ordinarily be paid on a weekly basis, such as retail salespeople, and for whom commissions constitute a significant part of weekly income")).

In concluding that severance pay is not "wages" within the meaning of Section 148, the Massachusetts Appeals Court has held that because the statute itself "refers to 'weekly' or 'biweekly' wages having been earned during a particular pay period and specifically includes in its definition 'holiday or vacation pay' as well as definitely determined commissions,". . . "[t]here is . . . no need to resort to the popular meaning of the term 'wages,' to Black's Law Dictionary, or to other statutes using the term 'wage.'" Prozinski v. Northeast Real Estate Services, LLC, 59 Mass.App.Ct. 599, 604-05 (2003).

Similarly, several trial courts have determined that bonuses such as the Retention Bonus

here at issue are not "wages" within the meaning of the statute. See Doucot, 734 F.Supp. at 193-94; NaviSite, Inc. v. Cloonan, 2005 WL 1528903 (Mass. Super.) (retention bonus and performance bonus "well outside the statute's reach"); Dennis v. Jager, Smith & Stetler, P.C., 11 Mass.L.Rptr. 567, 2000 WL 782946 *1 (quoting Baptista v. Abby Health Care Group, Inc., Civ. Action No. 95-10125-RGS, at 9 (U.S.D.C., D.Mass., Apr. 10, 1986) (Stearns, J.) ("the only impression that can possibly be derived from M.G.L. c. 149, §§ 148, 150, is that its intent is to protect laborers and casual wage earners who might otherwise be vulnerable to employer intimidation. There is no reason to extend to highly paid professionals the opportunity to collect treble damages and attorneys fees and costs incurred in enforcing their asserted contract rights").

Accordingly, DHL is entitled to judgment as a matter of law on Count I.

Counts II through IV

One question is common to the resolution of DHL's motion with regard to each of the remaining claims asserted in Counts II through IV: that is, could a reasonable jury conclude on the factual record before the Court (and giving every reasonable inference to Weiss, the non-movant) that DHL's termination of Weiss was not for good cause? If not, then DHL is entitled to judgment as a matter of law on each count.

Count II - Violation of the Covenant of Good Faith and Fair Dealing

In Count II, Weiss has alleged violation of the covenant of good faith and fair dealing inherent in the parties' employment relationship. Docket # 1-1 at ¶ 44. Developed as a limited exception to the long-standing rule that an employer may terminate an at-will relationship at any time for almost any reason, a so-called Fortune claim (derived from Fortune v. Nat'l Cash Register Co., 373 Mass. 96, 104-106 (1977), and its progeny) accrues when an employer

terminates an employee in bad faith in order to deprive him or her of commissions earned or almost earned. Id. Weiss has not adduced evidence from which a jury could conclude that DHL terminated Weiss in bad faith, for the purpose of depriving him of compensation due to him. The evidence to which Weiss points is either too attenuated and speculative to support liability (e.g., that the company was not performing well financially and "might . . . be looking to save," Docket # 22 at 19), or else it is not suggestive of a motivation to deprive him of commissions (e.g., that DHL was "woefully mismanaged," that it potentially faced criminal liability itself for the kickback scheme, or that Weiss was a scapegoat for broader corporate problems, id.)

A second line of cases, however, initiated by Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 429 (1981), is a corollary of the Fortune line of cases, and emerged in order to shield the employee where the termination decision was not taken in bad faith, but was without "good cause," resulting in a deprivation of "reasonably ascertainable future compensation" based upon past services. Id. The Gram theory of recovery for a breach of the obligation of good faith and fair dealing requires a threshold showing that the termination decision was taken without good cause (rather than in bad faith, as in Fortune, a distinction that may be practically insignificant, see infra) and more significantly that it resulted in (rather than having been motivated by) the employee's deprivation of measurable compensation based upon past services. See Hunt v. Wyle Laboratories, Inc., 997 F.Supp. 84, 90 (D.Mass.1997) (Saris, J.).

The first distinction between the Fortune and Gram lines (that of "bad faith" versus "lack of good cause") is blurred somewhat by the fact that the "good cause" inquiry itself involves the bad faith concept in that "good cause" is determined by the examination of whether or not there existed a reasonable basis for employer dissatisfaction, entertained in good faith, "for reasons

12

such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior" or whether there were "grounds for discharge reasonably related, in the employer's honest judgment, to the needs of his business." Klein v. President & Fellows of Harvard College, 25 Mass.App.Ct. 204, 208-09 (1987). "Just cause" or "good cause" is to be contrasted with discharge on unreasonable grounds or arbitrarily, capriciously, or in bad faith. Id.

DHL says it fired Weiss for (1) failing to document the warning he delivered to Garcia in June 2007 and; (2) for failing to further investigate Garcia's misconduct.[8] These reasons would suffice under the good cause standard to defeat Weiss's Gram claim, if held by DHL in good faith. A jury, however, could reasonably find otherwise.

A jury could reasonably make the following factual determinations: that Gargiles attended the meeting in the break room with Garcia and Weiss; that Gargiles, at that time, served as Garcia's direct supervisor; and, that in TWG's words, Gargiles in 2007 "had direct responsibility for all the rogue sales representatives" in District 117. That Gargiles bore a general responsibility to document the warnings or discipline delivered to his employees, as well as to investigate the misconduct committed by any such employee, goes without saying. Yet, like Weiss, Gargiles neither documented the warning delivered to Garcia nor investigated the misconduct further.[9] Moreover, the meeting between Garcia, Weiss and Gargiles was no secret.

---

[8] Implicit, but unstated, in TWG's report is the suggestion that Weiss participated in or knowingly tolerated Garcia's kickback scheme. At the hearing on the motion, DHL disavowed any such suggestion as the basis for Weiss's termination.

[9] Gargiles was not terminated when similar misconduct by other sales representatives under his management was uncovered later in 2007. The record indicates that subsequent to the meeting with Weiss and Garcia, but prior to TWG's investigation, Gargiles was demoted from

13

Prior to the meeting Gargiles, Weiss, Gargiles's supervisor (Cadigan) and a DHL Vice President of Sales (Katz) discussed Garcia's conduct, and the proper response to it, on a conference call. The participants in that call agreed to the subsequent meeting that occurred between Weiss, Garcia and Gargiles. Garcia's misconduct (of which the men participating in the call were aware), concerned improper establishment of multiple accounts – something different in nature and kind from that which came to light much later (namely, that Garcia sought kickbacks from customers). When a customer made the latter complaint to Weiss in April 2009, Weiss immediately referred it to his superiors at DHL. See Docket # 24 at ¶ 38. Finally, there is no evidence that termination is DHL's usual and customary practice in response to the failure of a supervisory employee to document a warning, or to the supervisory employee's failure to investigate misconduct of the type at issue in June 2007.

If the jury made such factual determinations, the jury could conclude that DHL fired Weiss not for reasons such as lack of diligence or failure to conform to usual standards of conduct, but for reasons unrelated to Weiss's performance. In short, a jury could reasonably determine that DHL did not hold in good faith the reasons advanced for Weiss's termination.

DHL also argues that Weiss cannot meet one element required by both the Fortune and Gram line of cases – that the terminated employee was deprived of compensation based upon past services. See Docket # 14 at 16-17. DHL argues that Weiss had not earned his Commitment to Success Bonus because under the terms of the plan, he had to remain employed by DHL until

---

District Sales Manager to Senior Account Executive (without any reduction in salary and without a final written warning) as a result of Routledge's September 2007 investigation into wrongdoing in District 117. Gargiles resigned in April 2008. Docket # 16 at 31; See also supra at 6-7.

14

January 2010, in order to receive the bonus. Id. (citing, inter alia, Barton v. Brassring, Inc., 2006 WL 3492161 at *5 (Mass.Super.) (retention bonus is not compensation for particular services already provided).

The argument would be persuasive were it made with respect to the original Commitment to Success Bonus Plan, which provided that Weiss needed to be employed on the date of payment to receive a $60,000 service-based bonus. Docket # 15 at ¶¶ 27-28. DHL modified the terms of the plan, however, to permit eligibility even if Weiss was not employed on the date of payment, for example if his position were eliminated, or in the event that he was terminated prior to January 2010, "without cause." Id. at ¶ 34.

Because a reasonable jury could conclude that Weiss was terminated without good cause, and that he was thereby deprived of measurable compensation based upon past services, I recommend that the Court DENY the motion with respect to Count II.[10]

### Counts III and IV - Alternative Contract Theories

The Court need not linger long over Weiss's remaining claims (for Detrimental Reliance in Count III and Unjust Enrichment in Count IV) because DHL's assertion that it is entitled to judgment as a matter of law depends in each case upon its assertion of good cause to terminate Weiss. As noted, supra, the issue of good cause presents a factual issue for resolution by the jury. I RECOMMEND that the Court DENY the motion with respect to Counts III and IV.

---

[10] Whether or not Weiss's damages in Count II include severance pay also presents a question for the jury.

III. CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court ALLOW DHL's Motion for Summary Judgment (Docket # 13) with respect to the statutory claim advanced in Count I, and DENY the motion the motion with respect to the contract claims advanced in Counts II through IV. [11]

                                /s / Leo T. Sorokin
                                Leo T. Sorokin
                                UNITED STATES MAGISTRATE JUDGE

---

[11] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).